Good morning. Welcome to the United States Court of Appeals for the Sixth Circuit. If you represent the appellant, please let us know how much time you want to reserve for rebuttal, even if you've already told the clerk that. With that, you may call the first case. Case No. 15-5689, George Vaughn v. Konecranes, Inc., et al., oral argument up to the scene, 15 minutes to the side. Mr. Marshall for the appellant. May it please the Court. I'm David Marshall. I'm counsel for Vince Vaughn. I wish to reserve two minutes for rebuttal. Mr. Vaughn, this is a products liability case. Mr. Vaughn was injured when a crane became a runaway crane, causing a 10-ton chunk of metal to hit him in the foot and rendering him on crutches for the rest of his life. The matter comes before this court because the trial court ruled that plaintiff said... Did it break his ankle, or what did it do? It broke off the heel pad. Once the heel pad's gone, there's no prosthesis to fix it. From forever now, the bone hits the skin and it hurts, and so you can't put pressure on it. The question here is, why did it happen? That is. That is. And we believe that it happened because I've given you two pictures that the court has asked for, and let me go over what those are now. One is the remote control box. Judge Merritt, you have the appellees in a brown folder up there. They should have a brown folder that has two pictures in it. One is the control. This is the controller itself. There's also a CD in there with some video showing the bridge, the crane move. I was told I was not able to show that to you live, and I brought that so you can watch it in chambers. Is that not otherwise in the record now? This is in the record. This is in the record. The video of the crane moving was taken at the time we all visited the factory. It is not necessarily in the video on the CD. It's not in the record. But it does show, and Ms. Higgins was present when the video was taken, it does show just simply the bridge of the crane moving. Let's talk about a crane such as this has three parts. It has a big old bridge that connects from one side to the other. It's a big old bar like a beam. On it runs a trolley that runs up and down, and there's a motor that pulls straight up and down called the hoist. Those are the three main components. For years, that was controlled by a wire. But, of course, as times became more modern, we now have remote controls. You have now before this picture is in the record, and it is a remote control. You seem in your brief to be arguing primarily that the problem must have arisen from the connector. These are contactors, and what they are, that's this, and these are dirty contactors. They're in the record, or at least in the discovery. Which one is this now? The one that says D&D Machinery on top. These are pictures of not the contactors that we don't have, but of some that are in the record showing. This is a bridge, quote, bridge contactor? Well, these contactors would be the switch to turn on the motor, any motor. This happens to be the bridge motor, is the one that turned on, and we couldn't turn it off. And because of that, it pulled a big 10-ton thing onto Mr. Vaughan's foot. So these are the contactors. They are activated magnetically. Once they come into contact, to best understand how this works, there's the transmitter. As you see here, it has four paddles. These are the... Those are not the contactors, but they are contactors as exemplars, and those are actual dirty ones. Those are ones that needed replacing, and they're in the record and somewhere else. This is the controller. It is worn on the belt, with a belt here in front, and you have the four paddles. Where are these contactors? Those contactors will be all the way up on the bridge, right next to the motor that they turn on. What happens is this sends a signal, which is on an FCC radio-approved signal, like one of the old telephones we used to have, portable telephones. It also sends a signal that is recognized by handshake. In other words, a special code. There's an antenna up there, up there on the ceiling by the bridge. It receives it. It says, okay, you are the transmitter, I am the receiver. Tell me what to do. That then sends a... A button or something down here? Yes, sir, those four paddles. And they... Up, down, sideways, and so on. Yes. They call them east, west, north, and south. That's crane talk. It's not really north-south. So it's... The system is controlled by this down here on the ground. It is. And it sends an electronic signal to the top. Yes. So that it can be... The whole device can be moved around. Correct. And that actually sends a small current signal to the contactor, which closes to... And it has a much stronger amount of electricity. So that there's... Anyway. But, yes, straight up and down. This is a remote control like for your TV. Do you think that the problem in the case that caused the event, the accident, is that these contactors were defective? Well, they wear out, and they have to be inspected. They get corroded, and so they became defective, yes. And it's not that difficult in terms of the system here. And I don't understand... This is the sort of issue that would require expert proof for causation, correct? It does, yes. So really the determinative thing here is whether the district court was correct to exclude your expert. Yes. And I'm... Yes. That is the determinative factor. Would you agree that the initial report doesn't really tie his groundwork to his ultimate conclusions, therein giving rise to this final report? I would agree with that, yes. So if we ignore then the initial report, we've read these reports. I mean, we have them. And I'm trying to figure out what part of this would you direct our attention to that you think remedies the defect that resulted in the district judge excluding this report? Well, let's first talk about this is a Rule 26 report. Do you understand the question? I do. Just tell me what page or paragraphs you think satisfy the deficiency that the district judge pointed out. What do you want us to look at? First of all, whether or not this report was required to satisfy Daubert is something that needs to be decided. What else is going to be used in connection with the summary judgment motion? I mean, this is what you offered to create a genuine issue of fact. Yes. And so if it was inadmissible, then you didn't have anything. And so, you know, the district court has to make a decision about admissibility based on the summary judgment evidence you have. I have. I'm going to get... But I think we're waiting for a response to Judge McKee's question. We are. And I have the list here. I'm going to turn to it. All right. The Heath report has the following components in it. One... Let me try to make this as easy as possible for you. Just tell me what pages you think remedy this problem. I don't... And if you can't do it now and you want to do that while she's talking and you tell me when you come back, that's fine. Okay. I will tell you that the report says he didn't inspect, that the Kronecranes didn't inspect the contactors. The standards say you have to inspect the contactors. And... Particular contractors. Yeah. And we're talking about standards in the industry that the judge chose to ignore when he threw me out. He did not... There is a standard here that says you have to inspect these contactors every month. It's the... It is a... But there's no evidence that the defendant didn't do that. There is evidence that the defendant didn't do that. And that is in the... Yes, they have... Where's the evidence that caused any problem? Excuse me? Where's the evidence that that caused the problem that occurred on the day your client was injured? That the contactor stuck? Yeah. Okay. Well, what you're dealing with... I mean, the fact that they don't meet some unspecified standard is irrelevant unless you can connect that to the plaintiff's injury. Well, what we have is we have a closed circuit. It's a very simple thing. The circuit closed. In other words, the remote control turned it on and then it got stuck closed. How do we know that happened because of the actions of the defendant? We know only that the circuit closed, that the components in the circuit are really very simple. We know only that those components are switches. We know that those switches stick. We know that those that once stuck, you can't unstick them if they're not in working order. We know, and we are limited to, the fact that after Kona Cranes came to the scene, they took these parts and took them away. They have never been found again. They eliminated those parts. We've been unable to... There's the evidence that they eliminated them as opposed to not their having failed to be sent back by the entity that tested them or that they were just, you know, totally lost in somebody's storage room. They were instructed to have them tested. They took them away per testimony of their employees. They took them away. And then they're gone. You're talking about the defendant here. I'm talking about the defendant. And we know they were tested. No, they were not tested. They're gone. No, no. We know the radio was tested. Okay. But the contactors... They were not sent to the same company that tested the radio. They disappeared. Well, because we've been denied the right to test them, does not the law give us some leeway, some deference to allow circumstantial evidence to be put in play? This is a really not a very hard concept. It is a closed... It is a circuit that froze, that welded itself shut. It kept going until the power to the whole thing was turned off. This is basically your spoliation argument. It is. The only way you can show or hopefully show causation is through a sort of presumption based on spoliation of the evidence. Basically, that's right, isn't it? Why would the law not also allow a simple circumstantial evidence argument that says, we've only got four parts here and we know that the radio didn't break? Isn't there a theory? Because where do you get that rule of law? Yon. Okay. The Yon case says specifically in that case that people who are not allowed access to certain... that experts who are not allowed access... This is the evidence argument. This is not an evidence about what circumstantial evidence might be sufficient to create a genuine issue of fact, right? I think the first threshold needs to be thought through, and then if it's unsatisfactory at that point, then the fact that the evidence is missing needs to be further...needs to allow further deference to the... What are you going to...could I just ask you, what are you going to put on if you get a trial in this case? This case was actually disposed of without any trial, and you don't have any expert now, I guess. What are you going to put on before the jury to show that there has been causation here? The only thing you're missing, as I see, I guess, is the element of causation. You've got to show that. Yes. So how are you going to show that? I'm hopeful I will be allowed to have an expert explain the parts of a crane, which are not that complicated, and say that these are the points where it could fail. These are the points where we know it did not fail by post-accident testing, and therefore it is most likely this point. And, again, this is not a very... It's a very simple machine. What are you going to do for evidence that the defendant had anything to do with whatever the failure was? The defendant had absolute control over the maintenance of all the cranes in this factory. Well, you know, sometimes things just happen, even if they've been adequately maintained. Yes, but these things, like runaway cranes, it's a mature industry. It's a mature machine. We are an advanced society, and we've got things down to where that doesn't just happen on cranes. I think we've got your point. All right. Jane Higgins. Jane Higgins on behalf of Kona Cranes. And I want to just briefly, because there was a lot of, I think, misinformation provided, clarify some of the factual issues to do with the crane. First of all, the contactors. Mr. Marshall's intense focus on the contactors is genuinely and truly misguided. That photograph that he provided is a component part of the contactors in question that was produced during the course of this litigation by CMWA. CMWA said, oh, one of the guys in the deposition said, oh, I had those contactors. We're like, hallelujah, bring them in. And what he brought in was that's actually a little component part. I thought they were lost. The actual contactor is. He brought in this little component part that he had maintained. It's Kona Cranes' position, and there's nothing, CMWA doesn't refute this, that CMWA maintained those contactors. Kona Cranes wasn't required to test them. The only thing sent off for testing was the radio transmitter. Kona Cranes was not instructed to go test the contactors. What happened was the contactors, yeah, that's an immediate thing to look to when a part moves with, when it's stated that the part is moving and no one's telling it to move. You can't stop it. So you look, okay, there's something's locked. Moving, it's got a, there's several explanations, I guess, but one of the key explanations would be that the contactors are making it move. That they fused or they burned out and caused it to lock in motion, yes, Your Honor. That's his theory. That's the first thing they checked because that's an immediate, that would be a likely reason for the event. We don't have the contactors because they were lost or something happened to them. The day of the accident, Kona Cranes came on site and with CMWA conducted an investigation, and they looked at the contactors. With CMWA present, Kona Cranes and CMWA, the contractors, all evidence in the record is they were normal. They were not burned. They did not fuse. They did not cause or contribute to this accident in any way. They were immediately ruled out. That's why someone at CMWA, their property, disposed of them. They were looked at. They were checked to make sure. You can tell by looking at them if they had burned out or fused. Purposely disposed of them? They knew they had a question, didn't they? I don't know what caused this and that this man had been hurt. CMWA, that was their property. They owned it. There were lots of component parts that were taken apart that day and looked at. They were left with CMWA once it was determined that didn't cause the accident. They were in good working order. Everyone moved on. If that didn't cause it, what else could have caused it? Isn't what we're missing here is the request for an adverse inference instruction when you say that it was the employer that had the contactors. Let's assume that the employer did dispose of them. Then even if there was the basis for that inference, would it be valid to apply it against Conocranes? Not based on the evidence in the record thus far. He seems to think that there's evidence that Conocranes got rid of the contactors and therefore it should be held against them. I know that's what he thinks. Does the record support that? No. The record supports that, to me, the most compelling evidence about who had possession of the contactors was the gentleman who produced the photograph that Mr. Marshall produced that produced these component parts of the contactors. He was a CMWA employee. He had them. If he had the component part, that stands to reason that CMWA would have maintained possession of the contactors. That's a red herring. Is there proof in the record as to tracing the contactors after the accident occurred? Is there anything in the record about the chain of possession, so to speak? No, because they were deemed not to be significant or important because they examined them and they were working fine. They were in good working order. So they were immediately ruled out as the cause or contributing cause to the accident. They moved on in their investigation. The focus then came to the radio transmitter. That's all in the record. Yes, Your Honor, it is. So the evidence in the record shows that after this accident they actually tried to utilize these contactors again in a test and they worked fine. No, you open them. These particular contactors are in a closed, sealed box up on the bridge. And so they immediately went up there, opened that sealed box, looked at them. Have they fused? Are they burnt? And to completely inspect them and ensure, they have to take them off. Oh, I will say this. After the accident, they worked the crane, attempted to get it to malfunction again, and it did not. You're reading all kinds of things into my question. I'm sorry, Your Honor. It tended to be pretty narrow, pretty simple. If these contractors had fused together, they wouldn't work if you tried it again, right? Correct. Or if they were somehow otherwise defective, presumably they wouldn't work. Correct, Your Honor. After the accident, did they try to make this crane, did they test this crane to see if it worked as it was intended to do? Yes, they did numerous times and it worked perfectly. Okay. So I'm just curious. Nobody ever seems to say that that by definition rules out the fact that these contractors were non-operative and if they had done an inspection on a timely basis, they would have seen that and they would have replaced them. That's the theory here. Yeah. And thank you, Your Honor. You just summed it up perfectly. Yes, that's the exact evidence necessary to refute the position. What is your client's position about what caused this to occur? I have an expert report and I've provided. You guys have numerous photos up there. My client's position, we hired an expert, crane expert. His theory is that it was operator error and that is the evidence in the record that substantiates CMWA. CMWA did its own internal investigation. Kona Cranes did an investigation. Once they ruled out, they sent the radio transmitter off, test came back that it was in proper working order. They tried the crane 10 times, 20 times that day. It worked perfectly fine after the accident. So this thing on our bench that starts at the top, Apple E1, that's your report? Yes, Your Honor. I tried to put some in order here that would be most helpful, but basically I'll get to the point then I'll work you through the photographs. Simple question. Yes, Your Honor. This is all of or part of your own expert's report? Part of. Zatarain. Zatarain. As in the rice. That's your guy. Yes. Yes, that's part of his report. I want to know. Okay. And the operator was employed by CMWA. Let me go back to my original question. Yes, and the plaintiff. If you could just answer my question, I'll get through with it. Your theory of what happened is operator error. You got that far in answering my question. Correct. Now, is that because the problem with de-energizing? So could you go ahead and explain that? I don't understand the science behind that theory that something was de-energized. The radio transmitter that moves the crane, by industry standards, by CMWA's own safety protocol, this is to be turned off, de-energized, when it's not in use. The plaintiff admits, Fullwell admits, against his own company's safety procedures, against his own knowledge about what was safe, he left it energized, it was turned on, when he handed it over to his co-worker. Now, the problem with that is, and there are some photographs here that show, when you do that, these levers, they put a metal bracket around it. CMWA had done that. When you hand it over, these levers move very easy. They move almost fluid. In one of the pages I took from experts' report, his theory is when he handed it over energized, which is why you don't hand it energized, you could potentially move one of these levers. Their hands are in gloves because it's very oily in there, so they've got big hands that come down. His theory is when he handed it over, he inadvertently hit the lever that moved the bridge. He let go. The testimony is when the bridge starts to move, and you will see there's this extremely heavy die. What CMWA determined was poor die layout storage. You're in a very confined, very narrow spot. This very heavy die is hanging down. The bridge moved slightly by the inadvertent touching of the energized lever. He let go, but there was enough with gravitational pull, with the weight, that that swung just enough from that movement. You've only got a 24-inch space in here that it swung just enough momentum to pin his foot. What happened was his foot got pinned between the two die sets. So it's Conocrane's position, our expert's position, and there's nothing in the record that refutes this. There's no other explanation that anyone has come up with. But I thought the record showed that this thing kept moving, and the guy with the controller couldn't stop it, and it wasn't ultimately stopped until somebody hit a master stop. It was moving, again, the theory is that it was moving because of gravitational. The master stop was hit five or so many minutes later. People had all come on. The fact that the master stop, the evidence is kind of murky about, it's not like it was swinging, they hit a stop, and it stopped. It's not going to stop. It's 10,000 pounds hanging 40 feet off. There were people around, motion. What kept it from moving could have been any number of things besides that master stop. The suggestion in the brief is that this thing kept moving until the third employer, whoever it was, hit an override. Now, is that supported by the record? No, it's not. They say they did go hit a master stop, which I would also say there's a lot of evidence in the record that there were other activities that contributed to that ceasing to move as much as it was. Just simply that the gravity, it's slowing down. But people coming around, pinning it in, would have kept the momentum from continuing on. There's no evidence at all, there's no evidence in the record at all that by anybody that's investigated, even CMWA, they did not implicate conocranes in any way for any cause or contribution to this accident. The only evidence in the record that substantiates what occurred once you rule out a malfunction of the radio transmitter is the expert proof submitted by conocranes that, as admitted by the plaintiff and by his co-worker, against policy and procedure, they passed the energized transmitter, and it would have been very easy to inadvertently hit that. And as you said, Your Honor, afterwards, the fact that the crane did not malfunction, they tried repeatedly to get it to malfunction again after the accident to see if they could figure out what had occurred, and it worked perfectly. He's apparently got to rely on the spoliation theory to get somewhere here, to get to the jury on some theory. But your answer to that is that your client never had possession or control over the contactor device that he's relying on as the problem and therefore could not have been guilty of spoliating that evidence. Is that your theory? Correct, Your Honor. The evidence in the record indicates that CMWA had that by virtue of their own employee bringing in a component part of that. I suppose somebody could argue in theory that the employer was acting as the agent of conocranes, but in fact it's the opposite, isn't it? Conocranes is a sub to the employer. Correct. So they're the agent, if you were analyzing it in a principal agency basis. Yes. Can you just tell me precisely what the evidence is from the CMWA employees about the turning over the box, not de-electrify? Was that conceded? They conceded that, yes. They conceded that they knew that was against safety policy and procedure. The plaintiff conceded it and that they said they were in a habit of doing it, and when you're there in the facility, it's always helpful to do the inspection, which, again, Mr. Vaughn's expert did not attend the inspection at the facility. But you see I was surprised at how easily those levers move, and actually the reason CMWA fashioned the metal bracket above it, when they come from the manufacturer, they don't have this metal bracket. This is another picture which shows you, again, how easy it would be to hit this lever, and honestly it moves fluidly. They fashioned this on there. To keep these levers from moving, you're wearing it on a belt around your waist, and when you're moving, you're in a very tight space, and since this accident they did move their dial layout so you weren't so confined, but in that tight space, you bend it over, that's on your waist, those levers could get hit and cause the crane to move inadvertently. Even without manual touching. Absolutely, which is why they fashioned this on there, was an effort to help prevent that from happening. So they knew that was a problem. We know that it was not de-electrified. We don't know exactly how it happened. Right, we know it was not de-electrified. My expert's opinion is that that caused an inadvertent movement of the lever, which caused the crane to move and gravity took over from there, and I'm running out of time. I would just say that, as the Court has noted, plaintiff's expert was excluded under Daubert. Clearly it was pure ipsy-dixit. His conclusions are pure ipsy-dixit. He doesn't have legal causation, therefore he cannot meet his burden of proof. And the issue of the spoliation is a red herring. As the Court pointed out, even given that full consideration, that's a mere scintilla of evidence which isn't sufficient to overcome summary judgment, and there's no other evidence in the record. Let me ask you a hypothetical question if I could. Is it theoretically or hypothetically possible that if Heath was to say, not only I'm a crane guy because apparently he has some experience with cranes, but I've investigated a lot of different crane accidents, and based on my education, training, and experience, the characteristics of this particular accident I've seen lots of other times and it's always been the contactors. So I'm making this up as I go along, of course. But had he said something like that, is it at least hypothetically possible that that could survive Daubert based on his experience? No, Your Honor. He'd have to show something to substantiate that, and based on my knowledge, and my expert was well-versed in the crane industry, that doesn't exist. If he's investigated 100 crane accidents and 99% of the time it's these contactors and he explains why, you don't even think that would survive Daubert? Well, as Your Honor aptly pointed out early on, the fact that this crane continued to work perfectly after the accident completely refutes the fact that it could. Okay, that's a little bit of a problem with my hypothetical. I agree with that. But I'm trying to figure out, we know this guy says he knows something about cranes, but is there anything in the record that he's investigated crane accidents before and therefore he can validly say? I guess his argument would be we should infer that he has the experience to be able to testify to these points, even though he doesn't tell us how he ties things together in the report. That's kind of the argument. That's the argument. Actually, to quote Mr. Marshall, I think in his brief he said he's got a lot of experience in, quote, lifting heavy things. But nowhere in there does he correlate his experience to how he reached his conclusions. You didn't take his deposition, right? No, but his report. So you don't really know what other experience he has or doesn't have. Just based on his CV. Other than his CV. Yes, Your Honor. All right, that's my question. Thank you. Okay, Mr. Marshall, you'll have your two minutes. As to Judge McKee, one of the specific pages of Mr. Heath's report, page 10, bullets 6 and 7, page 10 and 11, the bottom bullet carrying over onto page 11 of Heath's report. And page 15, which reads, as to the incident in the middle. Okay, thank you. Secondarily, there are multiple witnesses who saw this crane continue to pull for a substantial period of time. It was being pulled by a motor. It did not gravity and do like a pendulum. How do you know that? Because it kept pulling in a direction until the guy ran over to the main power switch, which is way over there. And we've got three witnesses that saw that. And given this summary judgment, that has to be taken as true. Well, the problem here, counsel, is an unusual problem in that you're having difficulty showing what caused this to occur. And there seemed to be at least more than one explanation. So, therefore, you relied upon spoliation. What do you say to her argument, counsel's argument, that her client did not have possession of the contactors and, therefore, could not have spoliated them? The last witness taken and the reason we had to have a supplemental report, a man named Chris Campbell, came in and testified that he was the guy that went there. He worked for Kona Cranes at the time. He was the last guy taken because he didn't work for Kona Cranes anymore. That he removed the contactors and that he took them back and that he was instructed specifically by CMWA management to have the contactors tested. That meets all the elements of spoliation. And where would we find that testimony? Chris Campbell. You cite it on page 36 of your brief. Thank you. ID 4506. Thank you. You will find that. And so, A, Kona Cranes knew Campbell, Christopher Campbell. And he works for? He's the guy for Kona Cranes that showed up after this accident. And he's the guy that investigated it. And then to add one more thing. What does he say happened to the contactors? He says they were taken back, that he took them back to the Kona Cranes office. That's his testimony. Only one other thing. I do have one other quick question. I'm looking at these parts of the report that you've directed our attention to. And your expert basically says that something either stuck or it was fused, basically. Yes. Now, if something was fused, that means that it was essentially joined together and then the electric signal couldn't break it apart, right? Yes. How could something have been fused because of these defective conditions of these contactors when it apparently continued to work flawlessly afterwards? Does he explain how it got unfused? Intermittent stuck contactors are a known phenomenon. Let me make sure that you understand what I'm asking. Your guy says two possibilities. Stuck, fused. I get stuck, I think. But once something is fused, the thing won't continue to work. Isn't that at least logic 101? The theory in intermittent fusion is that the fusion is incomplete and the spring is capable of breaking the fusion after the electricity ceases. Is there any discussion of that anywhere in this stuff? I asked one of them. There is discussion in some of the depositions involving Kona Crane's employees. Intermittent fusion does occur and is known to occur in this circumstance. Stick and unstick, that's what you're saying. Yeah, and that's because they close magnetically. It takes electricity to close them initially. Then a big bunch of electricity flows through. That big bunch of electricity, if it arcs at all, creates heat which causes fusion. Let me tell you what doesn't make sense. This report talks about this in the disjunctive. It's stuck or it was fused. When I asked you what fused is, you gave me basically a definition of stuck. If something is fused as opposed to being stuck, it isn't going to work again. That's a semantical argument about the meaning of the word fuse. The metal does melt and come together for a period of time. Whether or not the spring is capable of separating that metal again depends upon the amount of melted metal. Any kind of testing of other contactors by fusing them and then putting springs on and showing how they can pop apart or anything that an expert would normally do? He's on safety boards for brains. The question is, did he do any exponential experimental testing of any similar contractors at all? I'm not aware of that. I'm aware that this standard requires people to do it. Thank you. Judge Merritt has a question for Ms. Higgins. Yes, Your Honor. What he says the record shows about the testimony of a fellow named Campbell, which he just talked about, that is that your client did have possession, Campbell testified, of the contactors, and that it was during your client's possession that they were lost, bulliated, whatever you want to call it. What do you say to that? Here's what I say to that. Chris Campbell, as he noted, was a former employee. He did not leave under good circumstances. He gave testimony in the record that was contrary to all testimony. He's one employee out of many, Your Honor. But he did testify to that? I'd have to go back and look. I don't remember him specifically saying that. Without looking, I don't want to be dishonest to the court. He said a lot of things that weren't accurate. What I do know is that this— That's your opinion, but our question is whether there's a material dispute of fact about the evidence in the case. And if he said this is what happened, then there's a witness who says this. There may be one who says the opposite. But that's the problem. Let me help you out here so we can just finish this up. I think if people read 4506, there is some testimony about what should have happened to these contractors and who should have done it, but this guy doesn't know. Okay. Thank you, Your Honor. I didn't recall that being said. Okay. I think we're done. Thank you both for your argument. We'll consider the case carefully.